May we proceed? Yes. Good morning, John Rayburn Jr. for the United States. And with the Court's permission, I'd like to reserve two minutes for rebuttal. You'll have to keep track of your own time. Thank you. Will do. Your Honor, this case stems from an investigation that took place over a three-year period into a violent Asian organized crime operation. One of the key tools used in the investigation was a wiretap during four periods, four 30-day periods of the investigation. And as a result of that wiretap, the government gained evidence to bring charges of murder, kidnapping, excuse me, racketeering, and drug trafficking. The government concedes, Your Honors, that in fact, from period three, the wiretap tapes were sealed 60 days late in violation of the provisions in 18 U.S.C. 2815, the sealing provisions in the wiretap provision. However, I would note for this Court that the Supreme Court in Ojeda and this Court just recently in Hermannac noted that the sealing provisions in question are designed to protect the reliability and the integrity of the tapes. And in this case, Your Honors, I would suggest there was absolutely no evidence that the tapes that were suppressed were tampered with. And, in fact, Well, if that were true, then there wouldn't be any teeth in the requirement of immediate sealing, would there? Do we wait until something, until there's somebody has improperly used these tapes before we say that there has, that there was error in not sealing them on time? I think that's a fair question. Looking through all the cases that I have seen that have dealt with this issue, the only case where the tapes were sealed was the State of Louisiana case. And there, the courts found that the government, well, the Court wasn't sure whether the government ever sealed. And if, in fact, it had, the Court found that there was no viable explanation given by the government. But if there's a viable satisfactory explanation, then I would suggest Well, then that's really what this is about. Correct. That's correct, Your Honor. That's correct. It's not about prejudices, whether they have No, but that is a factor that courts take into play, into account, whether there is any prejudice to the parties or there's any tampering with the evidence. That's probably necessary for openers. Right. I think that's correct, Your Honor. I agree with that. I mean, absent that, the case is over. That's correct. And as it should be. The first thing you have to show is at least some plausible explanation that no harm has been done. Correct. Then we can start from there. But if you had harm coupled with a failure to seal on time, there's nothing left. I suggest the Court is correct. If there is harm, then the government should not be allowed to use the tapes. All right. I see that point. In this case, the 60-day delay period can be divided into two sections. One of them is, as defense notes in their papers, the core section, the 51 days of delay, the bulk of the delay. And that stems from the misunderstanding of the case agent in regards to when he needed to seal. The statute in question requires that he seal the tapes at the conclusion of a period or at the conclusion of an extension of that period or provide a satisfactory explanation. In this case, the agent believed that when the defendants used cell phones during the first three periods and then changed to a new cell phone, the law authorized him to wait until the end of the wiretap to seal all the tapes from that window. He didn't know what the law was. Your Honor, I would suggest that he was correct. Well, he was correct that it was a good-faith belief. And this Court, in a decision that came out approximately one year after the wiretap, said just that. They looked at the same scenario where almost identical facts. The government had in that case gone for two periods, the cell phone changed, and then they went for another two periods and sealed at the end. And the Court said, looking at this question, which we look at for the first time and up until this point was an open question in this circuit, we conclude that extension in this case means you have to seal after the first two periods. But they said the agent's belief in that case was a good-faith belief which justified him waiting until the end based on the law and the other factors known. And that's precisely what we have in this case. The facts are virtually indistinguishable from the Herman Eck decision. It was the first time, wasn't it, that this FBI agent was involved in this kind of work? It was the first time that he was ever the case agent on a wiretap, Your Honor. I don't know whether it was the first time he had ever worked on a wiretap, but I know it was the first time. But he was in charge. This was the first time he was in charge, in effect, of sealing these tapes. That's correct. It was his first experience of that, Your Honor. And I would argue for the ---- Basically, your position, I take it, is that, yes, he made a mistake, but it was in the circumstances not unreasonable. I believe that's correct, Your Honor, although I'm not even sure I would go as far as to say it was a mistake. The Ninth Circuit in Herman Eck said it was an open question until they ruled in this circuit. And so the only case law that was out there that was really on point was the Principi case, I believe I may be mispronouncing, from the Second Circuit, which is cited in Herman Eck. And the Court points out it's a different set of factors. In that case, it had to do with disclosing the tapes rather than sealing. And it was distinguishable. But the Court, nonetheless, the Ninth Circuit said that case gave further credence to the agent's belief that he could wait until the end of the entire period. And that's what happened here. The Herman Eck decision from this Court said that that was, in fact, a good faith belief that the agent possessed, and it justified the continuance, or it justified waiting until the end of the period. In this case, defense virtually doesn't even address the issue of Herman Eck. One brief doesn't mention the decision, and the other barely talks about it in an attempt to distinguish based on some semantics in regards to extensions versus renewals. The bulk of their argument in regards to the 51 days of delay stems from the claim that the agent didn't act in good faith. And if that were the case, then the Herman Eck decision wouldn't apply. But I would argue for this Court that the record before the Court suggests nothing of that kind. In fact, it suggests the opposite. During the wiretap period, as I believe the Court may recognize, there were four periods. In the middle of the third period, the agent sealed a number of tapes. He explained that he sealed those tapes because he was running out of storage room. If, in fact, it's the defense that needs this Court to believe that he were lying to the Court, if he actually knew that he needed to seal the tapes at the conclusion of the third wiretap period, then he would have just waited two more weeks. Let me step back. He sealed the tapes approximately two weeks before wiretap period three ended. If he knew that he had to seal at the end of the wiretap period, he just would have waited that two-week period. Evidence to demonstrate that there was his view was, in fact, good faith that he believed he could wait until the end of the wiretap period. And that's consistent with the way he operated throughout the investigation. At the end of the conclusion of the wiretap, ends on a Saturday, Monday morning he's calling the AUSA and saying, I'm ready to seal these tapes. When she calls him back on a Friday, he brings the tapes in and immediately delivers them to the Court. The agent in this case did everything that he was supposed to under his understanding of the law, and the mistake that he made was, in fact, a good faith mistake. Your Honor, as I turn to the second portion of the delay, the nine-day delay. In this case, the wiretap ended on a Saturday, and the tapes were sealed nine days later. But I would note for the Court, the agent called the former AUSA on Monday morning. That, what I believe, was April 23rd. If the former AUSA had sealed the tapes the next day on Tuesday, then we wouldn't be here. This Court has said that a one- to two-day delay is viable and constitutes proper sealing. But she didn't. She didn't seal on Tuesday, Wednesday, Thursday, or Friday. She effectively waited four days or five days, depending on your count. So the crux of this issue before the Court is whether those five days or nine calendar days constitutes a viable reason to suppress critical evidence in this case. And I would suggest, before getting into the law, that the District Court in this case, Judge Hatter, concluded that it did not, because the second set of tapes that were also the subject of motion to suppress were just the tapes from the fourth period. And they were sealed nine days late, based solely on the former AUSA's mistake. Let me just check. That's not clear to me. Sorry. The agent called her on Monday, is that correct? Correct. And when did she actually file the application with the District Court? That was on Friday or the following Monday? It was on Friday, four days later. On Friday, but then the District Court didn't get around to sealing it until the following Monday. That's correct, the next business day. So the basic delay was four days. That's correct. That week. I would argue four days attributable to the problems of the former U.S. attorney. That's right, a four-day delay, Your Honor. The case that deals with this, the very similar facts, is the Battle of Mente case from the Second Circuit, where there, like here, the government argued that the personal drugs and home life problems justified the sealing delays. I would argue to this Court the problems that the former AUSA had in this case were far more significant than what happened there. But I also would suggest to this Court that debate doesn't need to be taking place because the critical point of that decision, the critical factor in question was not how bad are your problems, but what impact do your problems have on your work product. And in the Battle of Mente case, and I would note it's at page 824 of that decision, they represent the fact that the only error the AUSA in Battle of Mente made was in regards to the sealing. In this case, Your Honors, there was a whole host of problems that this AUSA had occurring in her professional life, and I'll talk about those in a couple of minutes. But I would note defense talks about the fact that there is no proof that her problems were taking place at the time the wiretap sealing was required. And I would suggest the record is full of evidence to contradict that point. Let me just come back to something. Before the agent made the decision that he could wait until all of the wiretaps were completed before seeking to have them sealed, he never called the former assistant U.S.  That's correct. Did he ever claim that the reason he didn't call her was he found that there was no point in calling her. She was too irresponsible to be able to rely on. Your Honor, he did say that in a different context. At the hearing on this matter, he was asked about attempting to get a hold of her, and he pointed out that it became more difficult as the wiretap persisted, as we got towards period 4. But he never suggested that he needed to call her to ask about the sealing, because in his mind, he was confident he could seal at the end. And one of the exhibits that we introduced in the court below was an FBI policy statement which said virtually that same thing, that he was allowed to seal at the end. The case law on this ---- At the end of what? At the end of the four periods, at the end of the extensions. Your Honor, and that's what he was relying on and his understanding as in ---- He, in effect, misinterpreted, didn't he, the statute, in thinking that each of these new applications was merely an extension of the previous wiretap. That's correct, Your Honor. He did, in retrospect ---- Explicitly, as I remember, says you don't have to seal it if it's just an extension. That's correct. And he sort of said, well, it's all the same thing, so it looks like maybe it's an extension and therefore I don't have to seal it until it's all done. He did say that, Your Honor, but I would argue that he would know or he made a mistake in retrospect. This Court, in looking at the same facts for another agent, said, yes, you made a mistake, but that mistake was a good faith mistake that justified the delay in sealing, and that's what I would argue happened here. He did make a mistake. He was mistaken based on Hermannek and the decision that was decided after the sealing. But as in Hermannek, the Court here should find, and I believe the evidence shows, he was acting in good faith, and therefore it was a satisfactory explanation, which is built right into the sealing statute. If there is a satisfactory explanation, then the wiretap evidence is still admissible. And I would ---- Suppose he had ---- suppose there had been a decision of this Court stating that you couldn't wait until it had been ---- until the investigation and the wiretap had been completed, but you had to seal each wiretap when it was over, but also let us assume that unfortunately this agent was not aware of that opinion. Would that justify his failure to have them sealed? No, Your Honor. It wouldn't. And in fact, I believe as this Court said in Hermannek, after its decision, the argument that we would be making no longer applies. But the lay of the land, the law prior to the Hermannek decision, when this agent was operating, was just that. It was an open question. And until it had been closed, until it's been researched and decided by the courts, it remained an open question. So the critical inquiry in your view is whether it was established at the time he took this action that the law was to the contrary. That's correct, Your Honor. Well, how many of these ---- how many phones were being tapped? Your Honor, I believe there were five phones being tapped. The subject of suppression are only two of those phones. There are two defendant lines, but I believe overall there are five. Okay. And the subject of the suppression is which ones? It is calls from TT1, which is the first line, from defendant number ---- from defendant Ken Valong, and TT4, which is from defendant Paul Vu and his phone for period ---- Two phones, two cell phones. That's correct. And were the new applications a series of ---- were they with respect to the ---- they were with respect to those phones? Yes. What had happened, with the phones that are in question here, for the first three periods of the wire tap, TT1, line number one, was being wire tapped. And in the third period, TT4, cell phone number four, was wire tapped for the first time. And then in period five, both those defendants changed to two new cell phones. And that's when the ---- So they were keeping all of the tapes for these phones and holding them all, even though there were different phones involved, different phones and different taps involved, until they finished the whole investigation. That's correct. And you say that that is really the same as applying for an extension of the same tap on the same phone. And that's reasonable to believe. Right. Okay. And I would note, for the record, it was the identical person using the phone, calling the identical people, talking about the identical crimes. And in the meantime, the records of these tapes are just sitting around there, the taps. Well, the tapes, once they're all being stored, they're immediately stored. Yeah, they're stored. Correct. They're not sealed. They're not sealed with a court. They're stored but not sealed with a court. That's correct. You did, earlier in your argument, refer to some of these events as extensions. There were no extensions in this case, as far as legally. Your Honor, I would argue that there were. It's a technical argument. Yeah, it's technical. And it makes all the difference in the world. Well, can I explain what I mean? And if you lump the concept of what we're talking about into an extension, you're home free. But if this is not an extension, then we have the problems. That's right. And these are not extensions. Can we just take one of the cell phones for a moment, TT1? Sure. Okay. And it is operated for three periods. And then during the fourth period, the defendant changes to TT7, to a new cell phone. So it's cell phone number 1 for the first three periods. From period 1 to period number 2, that's an extension of cell phone number 1. All right. And when they go from period 3 to 4, he goes from cell phone number 1 to cell phone number 2. The law was unclear when these agents were working as to whether or not that was an extension. The court, in her next step, it is not. So this Court is correct. It was not an extension. But they said the belief or the expectation that it was, was a fair and accurate reason. I understand that. I understand that. But the point is, we're not dealing, we don't solve our problems by resorting to what is permissible by way of an extension. That's correct. That's correct. That has nothing to do with our problem. I agree with the Court. Now, it's only that you're arguing that somebody couldn't tell the difference. That's correct. But we can now. That's correct. Okay. Well, I'm curious. When you seek an extension of a wiretap, do you explicitly state that in the application? Is it a, you file a request or a motion to extend the period of the wiretap? In this case, they did. I don't care about this. As a general matter, if you ask for an extension, do you call it an extension? No. Not in this circuit. You call it a renewal. And the way you know that, Your Honor, for example, there is no doubt that going from period number one to period number two on the first cell phone was a, quote, extension. And going from period three to four, it was a new phone, and under the new law, it wasn't an extension. The exact language is used for both applications, or in this case, for all three applications. They called them renewals. It was purely the term of art. But I would. Let me tell you what's troubling me a little bit about this. As I understood, in answer to an earlier question of mine, you said that you thought the agent believed he was merely getting an extension. That's correct. But as I understand what you also said in response to my other hypotheticals, if in fact the law was to the contrary, he couldn't delay. Now, if in fact he thought he was getting an extension, but it was already established at that point that these were not extensions, but these were new applications, then I don't see how he can say, well, I was mistaken. I thought it was an extension, and it wasn't. That would have been an unreasonable assumption, much the same way, as you said, it would be unreasonable for the agent to ignore subtle decision, even if he didn't know about it. If I may try to restate my view, the agent didn't know, and I would suggest even today, had no idea what an extension meant or renewal meant. He was believing that he could seal at the end of the wiretap. That was the level. He didn't get into the nuances. Wiretap what? He didn't think, as I understand it, he didn't think it would be the end of a wiretap on a particular phone. It was the end of the investigation. Right. That's a big difference. Right. He understood, that's correct, Your Honor, he understood that he could seal at the end of all the investigations. That's what his understanding was, and he didn't. There's no authority to permit that would. But that's what Hermanick allowed. That's what, well, Hermanick said that was mistaken, but the belief was in good faith, and therefore, it justified not suppressing the evidence. That's precisely what Hermanick was looking at. Okay. We have more than used your time. We should hear from you. Thank you. Good morning, Your Honors. My name is Yolanda Barrera. I am attorney for Apelli Johnson, and also present is Alex Kessel for Apelli Liu. The other two attorneys are not present. They have submitted on the briefs. Okay. Are you both intending to submit argument? Yes, we are. And so we would like to split our time. I will keep track of the time. Initially, what I would like to address is one of the first questions that was asked by Your Honor, and that is with respect to the prejudice. Both Hermanick and Ojeda-Rios clearly indicate that Congress had something else in mind with respect to the prejudice, and that is it's the whole point of the statute that these wiretap conversations, that these tapes not be in a position where they, the agents, are able to tamper with them. Whether they, in fact, did tamper with them or did not tamper with them is not the focus of the statute. It is a prerequisite for the use by the government of these tape recordings that they be properly sealed, and what that means is, as this Court is already aware, that they must be immediately sealed upon the expiration of the order that was obtained in this case. Now, the government's basic position is, well, Hermanick saves this investigation because in Hermanick, which was decided afterwards, there was a determination by the Ninth Circuit that what extensions actually meant, and that was an open question at the time of the required sealing in this case. We disagree with the government's position with respect to Hermanick. Hermanick was totally distinguishable from the case here, and we do address Hermanick. I specifically address it in the brief that I filed at pages 11, 19, and 21. In Hermanick, the government obtained four wiretaps with respect to one individual, Flowers, the defendant Flowers. So when the government, when the government found out that Flowers had switched his phone, dumped a phone, and moved on to another phone, to another cell phone, they requested permission to tap the secondary phone. And they believed, the agents believed at that time that because it was the same defendant, the same investigation, the same everything, that all they were doing was getting an extension. That's not what happened in this case. And in addition, in Hermanick, when the agents were somewhat misled by the Court, because when the agents applied for the, what they considered an extension, when they applied, they called it an extension. They said, we want an extension of the wiretap as to Mr. Flowers. He has changed phones. They called it an extension. The Court apparently also called it an extension. That is totally different from the situation that we have here. Here, we don't have the same person, for starters. We have two different individuals. Yes. I believe that in Hermanick, the language that they used was, was, excuse me, was the government's belief objectively reasonable? And that is what has to be considered here. Was the agent's belief objectively reasonable, and does that rise to the level of a satisfactory explanation? And the response there would be, well, first of all, the agent here did not say, contrary to the government's representation, the agent didn't say, I thought these were all extensions, and therefore I was complying with the law, therefore make a finding that my belief is objectively reasonable. What the agent said, which sets it apart from Hermanick, is the agent said, I didn't know the law. I thought I could wait until the end of the case. He made a mistake in his interpretation of the law. And not only did he make a mistake with respect to how he viewed the law, he didn't consult with any other agent. This was the first time that he was in charge of this investigation, of a wiretap investigation. You would think that the first thing he would do is make sure that he was in compliance with the law. He is an FBI agent in charge of a very serious investigation. He admitted he never, never consulted with Special Agent Lau, who was the other agent in the case. He never consulted with any supervising attorney. And contrary to the government's representations, he did not indicate in his testimony that he made any attempt to ask the prosecutor, law in this case, with respect to what does the law require here. He never made an intent to do that. Now, there was some testimony later by him that this, in his opinion, this prosecutor was not doing her job. But he never testified that he attempted to ask her anything about his obligation. Kennedy. Are you saying that in that circumstance where he failed to check with anyone as to what the law required, any mistake he made by definition could not be reasonable? I think that that – I'm not saying that exactly. I am saying that the fact that he didn't know the law, that that is not a satisfactory explanation, and that is not an objectively reasonable explanation for what happened here. I am also saying, however, that the fact that he made no attempts to educate himself, that those are all – and he made no attempt to contact a supervisory, made no attempt to find out the law, that that is a – those are all factors that this Court can take into consideration with respect to the standard of was his position at the hearing, in this case, objectively reasonable. I mean, what if the agent were to say, you know what? I knew the law, but I forgot. I got so busy, I just forgot. I am so sorry, but I didn't tamper with this. Is that objectively reasonable? I mean, I think the government would have to admit that that is definitely not objectively reasonable. That is not a far cry from what happened here, where the agent just said, I didn't know the law. That's really what he said. Kagan. Ginsburg. The Supreme Court has said, as I take it, that negligence, you know, if you forgot to do it, that that's not good enough. I suppose that arguably not knowing that there was any requirement at all is worse than that. I believe so. Well, he knew there was a requirement of sealing. He just didn't know when he had to seal. Right. He believed that the sealing – that he knew there was a sealing requirement. He believed that the sealing requirement was at the end of the investigation, that he could continue to just keep these tapes and just keep collecting them regardless of the number. And when the entire investigation was over, whenever that was, months or years, at that point, he was supposed to take them in. He was wrong. He was mistaken. He did not know the law. And that is the situation that we have here. And the question that this Court must decide, is that enough to rise to the level of a satisfactory explanation? And was that objectively reasonable for the government to take that position? And I would suggest that we go back to the main case in this area, and that is the Supreme Court, Ojeda-Rios, which clearly says that does not rise to the level of a satisfactory explanation. That is an explanation. But that is not a satisfactory explanation. But along those lines now, even though our Court used the term objectively reasonable, the Supreme Court used the term excusable. Right? And they said it not only had to be a satisfactory explanation, but it had to be excusable. Now, you're not urging us to say that you win unless we determine that what this agent did was objectively reasonable. That's not necessarily the standard, is it? No. No. Okay. It has to be, according to the statute, a satisfactory explanation. And then according to the Supreme Court, it has to be not only that, or to be that, it has to be excusable. That is correct. Okay. And in this case, the government is defending on the basis that their position is the agent wasn't even wrong. That's your primary position. They're saying that the agent was not wrong in his interpretation of what his obligations were, and that is just so far off the mark because this was not an agent who was saying, oh, I read the law, I misinterpreted it, because it was the same individual. We were just ‑‑ I thought we were requesting an extension, and because the statute says an extension, we wait until the end of the extension. I just misinterpreted the law. And look at Hermannek. Hermannek supports me. Hermannek does not support that position because we have an agent who is not saying that he really thought this was an extension. And if he is saying that, and the government basically argued both, first argued that the agent was not mistaken, but that to the extent that he was mistaken, he was mistaken in believing that these were extensions. And so to the extent that the government is asking this Court to overturn the district court's decision, ruling in this case, because the agent was just mistaken in his interpretation of extensions, then that's where we get into was that objectively reasonable for the agent to believe that. Okay. You want to give your colleagues the floor? Yes. Thank you. Thank you for that consideration, sir. Good morning, Your Honors. Alex Kessel and I'm appearing. My client is Paul Lua, one of the appellees in this matter. I just want to reiterate a couple matters, if I might. First of all, to address one of the Honor's concerns about precedent and whether the officer agent mistakenly believed precedent. The precedent in this case is set in 1990 in the Ojeda-Rios matter. And the Supreme Court found that the sealing requirements are critical because of the nature and the probability of preserving the integrity of the tapes. And Ojeda, in that case, the agent there thought that he could wait until the end of the investigation. And many times we have extensions, we have renewals, we have long-term investigations that require multiple wiretaps. And it doesn't seem logical that the agent should wait until the end of the investigation because that would take away from the integrity of preserving the tapes. That's exactly what I believe the officer in this case thought, that he could wait until the end of the investigation. And Ojeda-Rios also recognized that there might be situations in which the agent's reason for delaying the sealing was sufficiently reasonable to justify it, didn't it? There are circumstances that talk about the delay in getting it to the court, the court having some delay, but in this case, Your Honor, the good faith belief of the agent in this case, he did seal some tapes. Now, he claimed at the hearing that the box, the storage box sort of was overflowing. But he also, you have to put in context that this agent never inquired about what he should do on an occasion when he has these tapes and he keeps them for 60 days. He never counseled. I didn't want the government's counsel to infer to the court that there's something in the record. He kept them for 60 days. Those are the tapes that he put in the strong box, and he finally had some of them sealed when the strong box was filled. Some of them were sealed when the strong box were filled. As far as my client's tapes, which is TT4, in fact, the district court's judge directly suppressed TT4 tapes, which actually have to do with my client's phones. Those were not sealed. Those were the exact tapes that were involved in the 60-day delay. And my point, to your honors, is that this officer now and the government saying the officer was mistaken in his belief, and then he didn't go to a USA, a prosecutor, who had her own personal problems, cocaine use and the like. However, and I just want to address that briefly because the government does seem to base some of the Your honors have to find that that's a legitimate excuse as well. I don't believe the record supports that the AUSA in this case was so out of it, so not in tune with her duties at work that the government should prevail that this was excusable. The record in this case, through declarations of the AUSA and questions of the officers, indicated that although she had problems, this Huaqing wiretap was a priority for her, and there's nothing in the record that suggests that she was taken away from this or had her mind on some other matters, which is contrary to the Second Circuit decision that the government cites for apparently a prosecutor that was overwhelmed completely in his whole job, duties, if you will, and taken away from, everything he was doing. I don't believe the record speaks of that in this case. The only last thing I would like to reference, because the first thing Your honors asked was about prejudice, I would agree with co-counsel that the sealing orders are somewhat of a strict liability absent a satisfactory explanation, and that prejudice is not a concern. However, the government in their moving papers talks about there's no evidence of any tampering, and I would suggest the defense submitted in their moving papers and in their briefs, there was evidence offered at the evidentiary hearing that at least on one of the tapes that was even offered, there was some discrepancies. For example, there was gaps in the tape that we know sometimes is. The court didn't make any finding on that. I don't believe they made any finding, although, as you know, Judge Hatter made no findings of fact in conclusions of law in his ruling, if you will. And, but I'm simply indicating to the court that there is a factual basis in the evidentiary record supporting Judge Hatter's decision that there was discrepancies in some of the tapes. And I'm simply indicating that I don't believe that's sufficient for the government to raise that as a basis for justifying excuse. Other than direct questions, I would submit the matter. Thank you, Your Honors. Thank you. I'll be brief. Just three points. First, I would ask the courts to examine the Ojeda decision, the Supreme Court decision, because it says exactly what the government is saying is here. There was a satisfactory explanation for the delay. It dealt with hard lines as opposed to cell phones. When the permanent decision came around, the Ninth Circuit looked at that same decision in the context of this new invention, cell phones, which had not yet been addressed. And I would again ask the courts to take a look at that decision, because I believe it clearly states that there was a satisfactory explanation. In regards to the tampering that defense has talked about, the tapes in this that are before this Court that were suppressed were never, none of them were challenged in regards to having been tampered with. I understand. Thank you, Your Honor. And lastly, I would just point out, when we're looking at the problems taking place in the former AUSA's life at the time of the sealing, during periods one and two of the sealing, she was admitted to having been a cocaine addict. She was addicted to the drug. During the last three periods, she was at a point where she was doing her 30 days of her addiction. And I would suggest to the Court the facts here are far more compelling of personal crisis in her life than they were in Battle Amente. Unless the Court has a question, I'll submit. Thank you.
judges: Schroeder, Friedman, Leavy